Approved:   Audrey Strauss
            Acting United States Attorney
            Southern District of New York

By:         Eli J. Mark
            Jeffrey C. Coffman
                Special Attorneys Acting Under Authority
                Conferred by 28 U.S.C. § 515
            Jonathan N. Francis
                Assistant United States Attorney,
                District of Connecticut

Before:     THE HONORABLE WILLIAM I. GARFINKEL
            United States Magistrate Judge
            District of Connecticut

- - - - - - - - - - - - - - - - - x

UNITED STATES OF AMERICA          :    **SEALED COMPLAINT**

        - v. -                    :    Violations of
                                       18 U.S.C. §§ 1349, 1343,
ARMANDO J. PEREZ and              :    and 1001
DAVID DUNN,
                                       COUNTY OF OFFENSE:
            Defendants.           :    FAIRFIELD

- - - - - - - - - - - - - - - - - x

DISTRICT OF CONNECTICUT, ss.:

        JENNIFER WAGNER, being duly sworn, deposes and says that she
is a Special Agent of the Federal Bureau of Investigation ("FBI"),
and charges as follows:

COUNT ONE
(Conspiracy to Commit Wire Fraud)

        1.    From at least in or about March 2018, up to and
including at least in or about December 2018, in the District of
Connecticut and elsewhere, ARMANDO J. PEREZ and DAVID DUNN, the
defendants, willfully and knowingly did combine, conspire,
confederate, and agree together and with each other, and with
others known and unknown, to commit wire fraud, in violation of
Title 18, United States Code, Section 1343.

        2.    It was a part and object of the conspiracy that
ARMANDO J. PEREZ and DAVID DUNN, the defendants, and others known

and unknown, knowingly and with the intent to defraud, having devised and intending to devise a scheme and artifice to defraud, and for obtaining money and property by means of false and fraudulent pretenses, representations, and promises, would and did transmit and cause to be transmitted by means of wire, radio, and television communication in interstate and foreign commerce writings, signs, signals, pictures, and sounds for the purpose of executing such scheme and artifice, in violation of Title 18, United States Code, Section 1343, to wit, then-Acting Bridgeport Police Chief PEREZ and Acting Personnel Director DUNN agreed to (i) embezzle confidential information from the City of Bridgeport ("the City") relating to the open and competitive examination required by the City's Charter to select the new permanent police chief, (ii) deceive the City into ranking PEREZ as one of the top three candidates, and ultimately awarding the permanent police chief position and resulting contract to PEREZ under false and fraudulent pretenses, and (iii) deprive the City of its right to control the use of its assets, by depriving the City of financially valuable information relevant to its decision on how to allocate the permanent police chief position and the resulting employment contract.

(Title 18, United States Code, Section 1349.)

<u>COUNT TWO</u>
(Wire Fraud)

3.      From at least in or about March 2018, up to and including at least in or about December 2018, in the District of Connecticut and elsewhere, ARMANDO J. PEREZ and DAVID DUNN, the defendants, knowingly and with the intent to defraud, having devised and intending to devise a scheme and artifice to defraud, and for obtaining money and property by means of false and fraudulent pretenses, representations, and promises, would and did transmit and cause to be transmitted by means of wire, radio, and television communication in interstate and foreign commerce writings, signs, signals, pictures, and sounds for the purpose of executing such scheme and artifice, in violation of Title 18, United States Code, Section 1343, to wit, PEREZ and DUNN executed a scheme to (i) embezzle confidential information from the City relating to the open and competitive examination required by the City's Charter to select the new permanent police chief, (ii) deceive the City into ranking PEREZ as one of the top three candidates, and ultimately awarding the permanent police chief position and resulting contract to PEREZ under false and fraudulent pretenses, and (iii) deprive the City of its right to control the use of its assets, by depriving the City of financially valuable

information relevant to its decision on how to allocate the permanent police chief position and the resulting employment contract.

(Title 18, United States Code, Sections 1343 and 2(a).)

## COUNT THREE
### (False Statements)

4.    On or about February 15, 2019, in the District of Connecticut, ARMANDO J. PEREZ, the defendant, willfully and knowingly did make materially false, fictitious, and fraudulent statements and representations in a matter within the jurisdiction of the executive branch of the Government of the United States, to wit, PEREZ falsely denied to FBI special agents that anyone had provided him confidential information related to the Bridgeport police chief selection process.

(Title 18, United States Code, Section 1001(a)(2).)

## COUNT FOUR
### (False Statements)

5.    On or about May 1, 2020, ARMANDO J. PEREZ, the defendant, willfully and knowingly did make materially false, fictitious, and fraudulent statements and representations in a matter being investigated by law enforcement based in the District of Connecticut and within the jurisdiction of the executive branch of the Government of the United States, to wit, PEREZ falsely stated to FBI special agents that (i)  he had told a former Bridgeport Police Department ("BPD") officer not to sneak into BPD headquarters to retrieve embezzled materials that were important in the police chief selection process, and (ii)  he had only seen that former BPD officer twice since his departure from service, omitting the meeting at which PEREZ first requested the former officer sneak into BPD headquarters.

(Title 18, United States Code, Section 1001(a)(2).)

## COUNT FIVE
### (False Statements)

6.    On or about February 13, 2020, DAVID DUNN, the defendant, willfully and knowingly did make materially false, fictitious, and fraudulent statements and representations in a matter being investigated by law enforcement based in the District of Connecticut and within the jurisdiction of the executive branch

of the Government of the United States, to wit, DUNN falsely denied to a FBI special agent and a United States Attorney's Office investigator that he had told a panelist, who was responsible for ranking the candidates in the final stage of the examination for the police chief, that the Mayor of Bridgeport wanted PEREZ to be ranked among the top three candidates.

(Title 18, United States Code, Section 1001(a)(2).)

The bases for my knowledge and for the foregoing charges are, in part, as follows:

7.    I am a Special Agent with the FBI.  I have been a Special Agent with the FBI for over twenty years.  I was a Supervisory Special Agent with the FBI from 2005 until 2011.  I am currently assigned to the New Haven Division Public Corruption and Civil Rights Squad.  During the course of my career, I have participated in hundreds of criminal and national security investigations, including investigations involving domestic and international terrorism, counterintelligence, murder, armed robbery, kidnapping, extortion, money laundering, narcotics trafficking, and the unlawful possession of firearms and explosives.  I am the case agent assigned to the current investigation.  In the course of my career, I have been the affiant on numerous complaints and search warrants.

8.    I am familiar with the facts and circumstances set forth below from my participation in the investigation of this matter, from my personal knowledge, from my conversations with other law enforcement personnel and civilian witnesses, and from my review of various reports and records.  Because I submit this affidavit for the limited purpose of demonstrating probable cause, it does not include all the facts that I have learned during the course of the investigation.  In addition, due to the ongoing nature of the investigation, dates and monetary calculations are based on the records obtained to date and are approximates, unless otherwise noted.  Where the contents of documents and the actions, statements, and conversations of others are reported herein, they are reported in substance and in part, except where otherwise indicated.

## Overview

9.    The charges in this Complaint result from a criminal scheme to rig the City's search for a new BPD chief in 2018.  As described in greater detail below, as a part of that scheme, ARMANDO J. PEREZ, the defendant, who was serving as the Acting BPD Chief at the time, conspired with DAVID DUNN, the

defendant, who is and was at that time the City's Acting Personnel Director, to deceive the City, which was required by its Charter to conduct an open and competitive examination process for a new BPD chief, by secretly rigging the process to ensure that PEREZ was one of the top three candidates and could be awarded a five-year contract to serve as the BPD chief.

10.   More specifically, DAVID DUNN, the defendant, who oversaw the examination process for the permanent Chief of Police position, retained an outside consultant ("Consultant-1") to assist with developing and carrying out the examination.  DUNN and ARMANDO J. PEREZ, the defendant, manipulated that process by, among other things, stealing confidential examination questions developed by Consultant-1, tailoring the examination scoring criteria to favor PEREZ, enlisting BPD officers to draft and write PEREZ's written exam, and attempting to influence an exam panelist. As a result of the scheme, the City was deceived into ranking PEREZ among the top three candidates and ultimately offering the full time position to PEREZ, which entailed entering into a five-year contract with PEREZ, the terms of which included a payout of more than $300,000 to PEREZ for accrued leave that the City paid out.

11.   Moreover, in an attempt to conceal their conduct, ARMANDO J. PEREZ and DAVID DUNN, the defendants, each lied to FBI agents about facts material to the criminal investigation.  Among other things, PEREZ provided false and misleading information about the assistance DUNN and others had provided him in connection with the examination process, including his use of a BPD officer to sneak into BPD headquarters to retrieve confidential information provided by DUNN about the process; and DUNN falsely denied requesting an exam panelist to ensure that PEREZ was scored as one of the top three candidates.

## Relevant People and Entities

12.   I have learned the following based on interviews of current and former City employees, interviews of other individuals involved in the police chief selection process, review of records obtained from witnesses, the City, and other entities, and review of publicly available information:

a.   The City is the largest city in Connecticut, with approximately 150,000 residents.  It is governed by a popularly elected mayor and a 20-member city council.  The City's police department has a budget of more than $100 million and more than 400 sworn officers.  The City's Charter governs numerous aspects of municipal administration, including the roles and duties of the chief of police, and it also provides  the minimum

qualifications for that position and requires an open and competitive test to fill the position.

       b.    ARMANDO J. PEREZ, the defendant, has been a BPD officer for more than 35 years.  On or about March 1, 2016, after the former Chief of Police resigned, the Mayor appointed PEREZ to serve as the Acting Chief of Police until the position was filled in accordance with the City's Charter.  As detailed herein, in or about November 2018, after the City held a purportedly open and competitive examination process for the position, and after PEREZ was certified as one of the top three candidates, the Mayor appointed PEREZ to serve as the Chief of Police.  In that role, according to the City's Charter, PEREZ is the head of the BPD and is responsible for the operation of the department consistent with the directives of the Mayor and the policies of the Board of Police Commissioners.

       c.    DAVID DUNN, the defendant, has been the Acting Personnel Director of the City of Bridgeport since approximately 2009.  In that capacity, as provided for by the City's charter, DUNN manages the City's personnel and payroll departments, and oversees the hiring for all city jobs, including the chief of police.  According to Chapter 17, Section 204 of the City's Charter, "The personnel director shall be a person thoroughly in sympathy with the application of merit and sound business principles in the administration of personnel."  Beginning in or about March 2018, as provided for by the City's Charter, DUNN oversaw the City's examination process for the position of Chief of Police.

       d.    Consultant-1 runs a company that specializes in executive searches for municipalities and other government entities. Consultant-1 had conducted numerous executive searches in Connecticut, including for chiefs of police.  Consultant-1 worked with a partner, who had conducted over 22 police chief searches since 2007.  In or around 2018, Consultant-1 was retained to conduct the purportedly open and competitive examination to select the City's permanent Chief of Police.

## The 2018 Police Chief Selection Process

       13.    Based on my review of documents obtained in the investigation, under the City's Charter, the Mayor may appoint a qualified member of BPD as the Acting Chief of Police whenever a vacancy occurs.  However, in order to fill the position of permanent Chief of Police, the City's Charter specifies that the Personnel Director is required to hold an open and competitive

"examination" to determine the three highest ranked candidates, from which the Mayor is required to select.

14. Specifically, the City's Charter, Chapter 17, Section 207, provides:

> The personnel director shall ... provide for, formulate and hold competitive tests to determine the relative qualifications of persons who seek employment or promotion to any class of position and as a result thereof establish employment and reemployment lists for the various classes of positions.

The City's Charter, Chapter 13, Sections 4(b)(2) & (3), further provides:

> The examination for the position of chief of police shall be open to any person possessing the minimum qualifications established for such position regardless of whether the applicant is currently or has ever been an employee of the city of Bridgeport. The examination shall be open and competitive and shall not be promotional. Whenever a vacancy arises in the position of chief of police, the personnel director shall, upon request, certify to the mayor the names of the three (3) candidates standing highest upon the employment list for such position. If no such list exists, the personnel director shall, within 150 days of the request, hold a test for such position and shall, upon the establishment of an employment list, certify to the mayor the names of the three persons standing highest thereon.

15. On or about February 26, 2018, the Mayor sent DAVID DUNN, the defendant, a letter instructing DUNN, in his role as the Personnel Director, to initiate an open and competitive examination for the position of Chief of Police as required under the City' Charter, and to then certify to the Mayor, within 150 days of the request, the three highest scoring candidates from that examination as also provided for by the City's Charter.

16.   Based on my interviews of City employees and Consultant-1, and review of documents, DAVID DUNN, the defendant, in his role as Personnel Director, in fact initiated and then supervised the examination process for the permanent Chief of Police position, reporting throughout the process to the Mayor's office, in particular the Mayor's Chief of Staff (the "Chief of Staff").

17.   At the outset of the process, the Chief of Staff, stressed to DAVID DUNN, the defendant, the Mayor's view that the Chief of Police test must be conducted professionally, fairly, and timely, in accordance with the City's Charter.

18.   Based on my interviews of the Chief of Staff and Consultant-1, and my review of documents, in or around March 2018, DAVID DUNN, the defendant, acting on behalf the City, hired Consultant-1 to prepare and administer the examination for the Chief of Police position.   Consultant-1 reported exclusively to DUNN.

19.   Based on my review of invoices, Consultant-1 was paid by the City for the work performed.   Consultant-1's fee covered, among other things, management and administration of the entire examination process, including solicitation of applicants, development of written and oral exams and associated scoring guides, and arrangement and moderation of panel exams of the applicants.

20.   Based on my review of City documents and interviews of Consultant-1, the police chief "examination" as required under the City Charter in fact had four stages that Consultant-1 administered:

**Stage 1 -** A review of candidates' résumés and cover letters;

**Stage 2 -** A written exam made up of a questionnaire and two essay questions (the "Written Exam");

**Stage 3 -** A telephonic oral exam conducted by Consultant-1 (the "Oral Exam"); and

**Stage 4 –** A panel interview conducted by five independent panelists (the "Panel Interview")

(collectively, the "Examination Process").

21. Based on my review of documents from the City and Consultant-1, I have learned that, in total, the permanent Chief of Police Examination Process supervised by DAVID DUNN, the defendant, cost the City approximately $17,000, inclusive of Consultant-1's services and related expenses.

### PEREZ's and DUNN's Conspiracy and Scheme to Defraud

22. In or about May 2018, at the direction of DAVID DUNN, the defendant, Consultant-1 commenced the search for a Chief of Police by preparing and advertising a profile for the position, which included required minimum qualifications and characteristics of an ideal candidate, including "honesty," "integrity," and "strong character." According to the profile prepared by Consultant-1, the police chief position came with a salary range of $132,374-$145,428, plus benefits, and was for a five-year term, with the possibility for an additional five-year term.

23. According to Consultant-1, DAVID DUNN, the defendant, instructed that there should be no requirement that a candidate possess a bachelor's degree, or any penalty for candidates who did not have one. In Consultant-1's experience, it is unusual for a police chief not to have a bachelor's degree. Based on my review of applications submitted for the position, ARMANDO J. PEREZ, the defendant, does not have a bachelor's degree, and was the only applicant without one.

A. *Consultant-1 Prepares a Draft of the Written Exam Materials and DUNN Provides Them to PEREZ*

24. On or about May 12, 2018, Consultant-1 sent DAVID DUNN, the defendant, an email with the subject "Revised Advertisement & Testing Questionnaire & Recommendations for Process." Attached was a "status report of work completed to date and recommendations on how to move forward with interview process as requested." Also attached to the email was a draft of certain confidential examination materials pertaining to the Written Exam portion of the Examination Process, including a questionnaire, essay questions, and scoring guide for the Written Exam. Consultant-1's email specifically requested that DUNN "please keep very confidential."

25. A little over a week later, on or about May 21, 2018, Consultant-1 sent DAVID DUNN, the defendant, an email with the subject "Bridgeport Police Chief Search." Attached were the finalized questionnaire and essay questions that Consultant-1 intended for use in the Written Exam stage of the police chief Examination Process, along with the associated scoring guide,

which set forth the points to be awarded for various types of answers on the candidates' questionnaires.  Consultant-1 noted in the body of the email that the attachments were "confidential."

26.  Notwithstanding that designation as "confidential," DAVID DUNN, the defendant, then agreed to provide secretly that confidential material to ARMANDO J. PEREZ, the defendant, to ensure that PEREZ performed favorably on the examination and thus would remain eligible to be in the top three. In particular, according to a then-BPD officer who worked for and closely with PEREZ ("Officer-1"), PEREZ provided Officer-1 with a scoring guide for the questionnaire.[1]  Officer-1 confirmed that Consultant-1's scoring guide was similar to the scoring guide PEREZ gave him.

27.  Based on my interviews of other applicants for the police chief position and my review of emails, none of the other applicants received Consultant-1's scoring guide for the questionnaire or any other part of the examination process.

B. *DUNN Ensures PEREZ's Timely Application and PEREZ Directs BPD Officers to Prepare His Resume and Cover Letter, Which He Submits to Apply for the Position*

28.  On or about May 31, 2018, Consultant-1 sent DAVID DUNN, the defendant, an email with the subject "Status."  The email noted that Consultant-1 had received résumés from six applicants. However, as of that time, ARMANDO J. PEREZ, the defendant, had not yet submitted an application for the chief position.  Later that day, DUNN forwarded Consultant-1's email to PEREZ, including Consultant-1's discussion about the "status" of the process, and asked in his email, "R u ready to mail in your resume?"

29.  Based on my review of emails produced by the City and from DUNN's personal email account, DAVID DUNN, the defendant, did not forward Consultant-1's May 31, 2018 email to any other

---

[1] Officer-1 is a former BPD officer who has been interviewed by the FBI multiple times and provided information to the FBI with no promise of any benefit.  Officer-1's information has been corroborated by other witnesses, emails, photographs, and recordings.  Officer-1 was put on administrative leave by ARMANDO J. PEREZ, the defendant, in July 2018, and eventually retired from the BPD, following a report to BPD Internal Affairs that Officer-1 had used racist language in certain electronic messages to another BPD employee.

candidates or email any other candidates to inquire if they were prepared to apply to be the chief of police.

30. Based on my interviews of Officer-1, shortly thereafter, ARMANDO J. PEREZ, the defendant, directed Officer-1 and another BPD officer who worked for PEREZ ("Officer-2") to help draft PEREZ's résumé and cover letter for the position. Officer-1 and Officer-2 both worked on PEREZ's résumé and cover letter during BPD work hours, while in the BPD offices, and using BPD computers.[2]

31. On or about June 5, 2018, ARMANDO J. PEREZ, the defendant, sent Officer-1 and Officer-2 an email invitation to a meeting the next day in PEREZ's office, which listed the subject of the meeting as "[Officer 2] - Consultation." Both Officer-1 and Officer-2 confirmed, in interviews with law enforcement, that the purpose of that meeting was to work on PEREZ's résumé and cover letter.

32. On or about June 6, 2018, shortly before the scheduled meeting with ARMANDO J. PEREZ, the defendant, Officer-1 sent Officer-2 an email with the text "Cover letter" and attaching a document titled "Document1." The document titled "Document1" is a draft cover letter for PEREZ that appears to be substantially similar to the one PEREZ eventually submitted to Consultant-1.

33. On or about June 8, 2018, Officer-2 sent ARMANDO J. PEREZ, the defendant, an email with the subject "Document Review." Attached to this email was a draft résumé and cover letter for PEREZ that Officer-1 and Officer-2 informed the FBI they had helped prepare. Officer-1 also took a screenshot of this email, as well as a screenshot of Officer-1's response containing suggested changes, which he provided to the FBI.

34. On or about June 9, 2018, Consultant-1 emailed ARMANDO J. PEREZ, the defendant, "Just wanted to make sure you have a copy of the profile for the Police Chief Search – the deadline i[s] June 15 for résumés and cover letter to me and my partner as indicated on the attached." Approximately 15 minutes later, PEREZ responded by email, "Thanks, I have completed all the required material and will submit it on Monday."

---

[2] Officer-1 further stated that the scoring guide was used in preparing the resume and cover letter. Officer-2 stated that while he worked with Officer-1 at PEREZ's direction to draft a resume and cover letter, he did not recall seeing the scoring guide.

35.  On or about June 11, 2018, ARMANDO J. PEREZ, the defendant, sent Officer-1 and Officer-2 an email invite for a meeting that day at 11:30 a.m. in PEREZ's office.  The listed subject of that invitation was "Meet with [Officer-2]."  According to Officer-1 and Officer-2, the purpose of that meeting was to complete PEREZ's résumé and cover letter.

36.  On or about June 11, 2018, less than an hour after the scheduled meeting with Officer-1 and Officer-2, ARMANDO J. PEREZ, the defendant, emailed his résumé and cover letter to Consultant-1, copying DAVID DUNN, the defendant, among others, to apply for the police chief position.  Other than address modifications, the cover letter and résumé that Officer-2 had sent to PEREZ on June 8, 2018 was substantively identical to the one that PEREZ emailed to Consultant-1.

37.  In total, sixteen candidates, including ARMANDO J. PEREZ, the defendant, submitted résumés and cover letters applying for the police chief position.  After reviewing the resumes, and consulting with DAVID DUNN, the defendant, Consultant-1 eliminated five candidates in this first stage of the Examination Process, but not PEREZ.

      C. *PEREZ Directs BPD Officers to Prepare His Written Exam, Including Essays*

38.  On or about June 18, 2018, Consultant-1 emailed ARMANDO J. PEREZ, the defendant, and the other ten remaining candidates informing them that Consultant-1 had reviewed their resumes and believed they met the minimum qualifications for the position.  As a result, because the police chief position was "under the Bridgeport Civil Service System," a "written test is required."  Consultant-1 further explained that the Written Exam portion of the process consisted of a three-page questionnaire and two essay questions.  Consultant-1's email directed that each candidate had to personally complete the Written Exam. Specifically, Consultant-1 instructed in her email to PEREZ, "The attached Written Exam/Questionnaire will be graded so please complete yourself and please provide accurate/truthful information."  Similarly, the instructions on the attached written exam provided, "This questionnaire represents a testing process (points will be assigned so complete all questions) and as such you are to complete it yourself.  Similar to an application you need to be truthful; discovery of inaccuracies will be cause for rejection/disqualification."  The email and instructions required that the Written Exam be completed by June 26, 2018, and that they be emailed directly to Consultant-1.

39.   While Consultant-1 was responsible for grading applicants' Written Exams, which included their written questionnaires and essays, as part of the scheme alleged herein, DAVID DUNN, the defendant, took steps aimed at ensuring that ARMANDO J. PEREZ, the defendant, would score favorably on the Written Exam. In particular, according to Consultant-1, DUNN asked Consultant-1 to make certain changes to the scoring system for grading the questionnaires, all of which benefitted PEREZ.  For example, at DUNN's direction, Consultant-1 agreed to modify the scoring system to: award more points for duration of law enforcement experience; eliminate any penalty for not residing in the City; and eliminate any penalty for the lack of a Bachelor's degree.  All of these changes benefitted PEREZ, and in some cases PEREZ alone.  In particular, PEREZ had the longest tenure in the BPD of any applicant, was the only applicant not to have a Bachelor's degree, and did not reside in the City. Moreover, at the request of DUNN, Consultant-1 also agreed to award extra points to PEREZ for his service as acting police chief.

40.   In addition, according to Officer-1, when Consultant-1 emailed the Written Exam to the applicants, ARMANDO J. PEREZ, the defendant, already had both a portion of the Written Exam and the scoring guide, notwithstanding the fact that the Written Exam materials were the City's Confidential Information and had been expressly so designated by Consultant-1.

41.   Moreover, ARMANDO J. PEREZ, the defendant, directed BPD officers under his command to complete the Written Exam for him, as he had also directed them to do with his resume and cover letter, and notwithstanding the specific instructions from Consultant-1 that PEREZ was to complete the written exam "yourself."  In particular, according to Officer-1 and Officer-2, in or around June 2018, PEREZ directed them to assist in preparing his written responses for both the questionnaire and the essay questions, which they did on City time while they were at work.

42.   Based on my review of City emails, I am aware that on or about June 20, 2018, ARMANDO J. PEREZ, the defendant, sent Officer-1 and Officer-2 an email invitation to a meeting on June 21, 2018, which listed the subject of the meeting as "Private Matters."  According to Officer-1 and Officer-2, the purpose of that June 21 meeting was to prepare PEREZ's responses to the Written Exam.

43.   On or about June 21, 2018, Officer-1 sent an email to Officer-2 with research to be used to help prepare the second essay response for ARMANDO J. PEREZ, the defendant.

44. According to Officer-1 and Officer-2, they substantially completed both essays for ARMANDO J. PEREZ, the defendant, including by researching, drafting, and editing PEREZ's responses, some of which was done while at work.

45. On or about June 25, 2018, ARMANDO J. PEREZ, the defendant, emailed his completed Written Exam, including the written questionnaire and essays, to Consultant-1, copying DAVID DUNN, the defendant, among others. Consultant-1 wrote back that day to PEREZ, "It is not appropriate for David [DUNN] to have a copy - no other candidate is doing that - all the questionnaires will be graded by me and David [DUNN] will see all of them at the same time."

46. Approximately 25 minutes later, ARMANDO J. PEREZ, the defendant, forwarded Consultant-1's admonishing email to DAVID DUNN, the defendant, writing, "David, you are the Civil Service Director no one ever told me that you are entitled to see my essay, I am confuse." After Consultant-1 spoke with DUNN, Consultant-1 wrote to PEREZ, "David [DUNN] said he has not reviewed so everything is ok."

47. Consultant-1 scored the Questionnaire and Essays. The changes to the scoring guide Consultant-1 made at the direction of DAVID DUNN, the defendant, increased the score of ARMANDO J. PEREZ, the defendant, and he was not one of several applicants eliminated based on the written portion of the Examination Process.

   D. *DUNN Provides PEREZ With the Oral Exam Interview Questions In Advance of PEREZ's Interview With Consultant-1*

48. On or about July 17, 2018, Consultant-1 emailed ARMANDO J. PEREZ, the defendant, "You did pass the written exam so you will now move on to the oral exam - a telephone interview with me. . . . [T]he oral exam will be part of the process to determine who are the finalist candidates."

49. Also on or about July 17, 2018, Consultant-1 sent DAVID DUNN, the defendant, an email with the subject "Status Report for Police Chief Search." That email had two attachments. The first attachment was titled "Police Chief Search Status Report july 2018." The second attachment was titled "Draft oral exam for top 8 Police Chief Candidates," which according to Consultant-1's email, contained "the oral interview questions that I plan to use."

50. The next day, on or about July 18, 2018, DAVID DUNN, the defendant, forwarded that email (including attachments) to

ARMANDO J. PEREZ, the defendant, writing, "Call me please." Based on my review of emails provided by the City and obtained by judicially authorized search warrants, DUNN did not email the questions for the Oral Exam to any other candidate.

51. According to Officer-1, on or about July 20, 2018, ARMANDO J. PEREZ, the defendant, directed Officer-1 to access PEREZ's City email account and print the attachments to the July 18, 2018 email from DAVID DUNN, the defendant, including the "Draft oral exam for top 8 Police Chief Candidates" document. Officer-1 stated that he followed PEREZ's instruction by opening those attachments on PEREZ's BPD computer and printing them on PEREZ's office printer. Officer-1 further stated that PEREZ requested Officer-1's assistance because PEREZ did not want inadvertently to print those attachments to a different BPD printer where the document could be seen by others. Officer-1 also took photographs of the attachments to DUNN's July 18, 2018 email, which Officer-1 has provided to the FBI. I have compared Officer-1's photographs of those documents to the attachments that DUNN forwarded to PEREZ on July 18, 2018, and have determined them to be identical.

52. According to Officer-1, ARMANDO J. PEREZ, the defendant, then instructed Officer-1 to use the questions that DAVID DUNN, the defendant, had provided to PEREZ to draft answers that PEREZ could use in his Oral Exam with Counsultant-1. However, Officer-1 was placed on administrative leave before Officer-1 could complete draft answers to the Oral Exam questions for PEREZ.

53. Based on my participation in the investigation, I know that the attachments to the July 18, 2018 email from DAVID DUNN, the defendant, consisted of confidential documents and information that belonged to the City and that were neither intended to be shared with the candidates nor made available to candidates other than ARMANDO J. PEREZ, the defendant. In particular, based on my interviews with Consultant-1, candidates did not have and were not allowed to have access to the interview questions in advance of the Oral Exam. Moreover, according to three other applicants for the position, who have provided information to the FBI, they never received the Oral Exam questions in advance.

E. *PEREZ Requests Officer-1 Sneak into BPD Headquarters To Retrieve Confidential Test Information and To Help Him With the Oral Exam*

54. On or about July 30, 2018, after directing Officer-1 not to return to the office, ARMANDO J. PEREZ, the defendant, visited Officer-1 at his home. Officer-1 recorded this visit on

his cellphone.[3]  During the visit, PEREZ asked Officer-1, "Where did you leave the stuff you were working on for me?"  Based on my review of the recording and conversations with Officer-1, this was a reference to the draft answers to the Oral Exam questions that Officer-1 had been preparing for PEREZ to use.  Officer-1 responded that it was in a file stored on Officer-1's BPD computer, and offered to sneak into BPD headquarters in order to pick up the materials.  In reply, PEREZ requested Officer-1 to "sneak in there for me please."

55.  On or about July 31, 2018, ARMANDO J. PEREZ, the defendant, emailed himself the July 18, 2018 email and attachments from DAVID DUNN, the defendant, including the "Draft oral exam for top 8 Police Chief Candidates" document.  However, PEREZ did not have access to the draft answers to those questions that Officer-1 had been working on at PEREZ's direction.

56.  On or about August 1, 2018, Officer-1 spoke by phone with ARMANDO J. PEREZ, the defendant.  On that call, which Officer-1 recorded at the direction of the FBI, Officer-1 stated that he had tried to go to BPD headquarters the prior night, but that it was "just a little much," and he asked PEREZ if he wanted him to try to get in again.  PEREZ responded, "If you can do it please. Cause I'm running out of time, [Officer-1].  And you're the only one who can help me."  PEREZ also told Officer-1 the best way to sneak in, including which doors and stairs to use, and the best time to go in to increase the chance that nobody would be around. When Officer-1 suggested that the two of them could go over the materials together in the future, PEREZ responded, "Yeah," and that he needed to "start studying."

57.  On or about August 2, 2018, Officer-1 spoke again by phone with ARMANDO J. PEREZ, the defendant.  During that call, which Officer-1 recorded at the direction of the FBI, PEREZ said "And if you can bring me that stuff.  I'm lost here man."  Officer-1 responded that he thought he "remember[ed] some of the test questions," and would try to get them together.

58.  Later on August 2, 2018, Officer-1 spoke again with ARMANDO J. PEREZ, the defendant, by phone.  On the call, which Officer-1 recorded at the direction of the FBI, Officer-1 told PEREZ he was "trying to struggle through the questions," but was not yet done.  PEREZ responded that Officer-1 should not "worry

---

[3] Officer-1 did not record this meeting at the direction of the FBI. Officer-1 provided the recording of this meeting to the FBI the next day, July 31, 2018.

about" that, and focus instead on Officer-1's own employment situation.

59.   On or about August 9, 2018, Consultant-1 conducted the Oral Exam of ARMANDO J. PEREZ, the defendant, by telephone. According to Consultant-1, after conducting interviews with all candidates, Consultant-1 determined that the applicants scored fairly evenly on the Oral Exam.

### F. *DUNN Attempts to Influence the Panel Interview For PEREZ's Benefit*

60.   On or about September 4, 2018, Consultant-1 invited ARMANDO J. PEREZ, the defendant, and the other six remaining candidates to participate in the final stage of the Examination Process, a panel interview with five independent panelists, including Panelist-1.   The Panel Interview was eventually scheduled for October 19, 2018.

61.   On or about September 10, 2018, the *Connecticut Post* published an article critical of the secrecy surrounding the police chief hiring process. ARMANDO J. PEREZ, the defendant, was quoted as confirming "I'm a candidate," and stating "That's all I know. . . .   I've stayed away from (seeking details about the search process) just to make sure it was objective. . . .   I don't want anybody to say 'A.J. influenced.'"

62.   In response to this article, DAVID DUNN, the defendant, circulated an email to the Mayor's office with bullet points for a proposed statement outlining how, according to DUNN, the selection process had worked and detailing how it complied with the City's Charter.   DUNN specifically suggested that the City's response should emphasize the "Confidentiality of test questions/candidates/examiners," writing that "This exam for Police Chief is a competitive selection process for an executive level employment position and at a minimum, while ongoing, the process should be confidential to ensure integrity and fairness of the process."   DUNN knew, and did not disclose, that those statements were false and, in particular, that he had already given PEREZ (but no other candidate) various confidential information about the Examination Process, including the Oral Exam questions and Consultant-1's scoring guide.   DUNN's input was incorporated, in part, in an October 30, 2018 "op-ed" by the Mayor defending the integrity of the City's police chief selection process.

63.   On or about October 9, 2018, approximately ten days before the Panel Interview of ARMANDO J. PEREZ, the defendant, Consultant-1 sent DAVID DUNN, the defendant, an email with the

subject "Suggested Questions for the Interview Panel." Although the email referred to "attached highlighted questions," there was no attached document. One minute later, Consultant-1 sent DUNN another email with the subject "Attachment" and attaching a document titled "Bridgeport Police Chief Questions," which contained 42 suggested questions for the panelists to ask, 15 of which were highlighted.[4] According to Consultant-1, this information – like the information about the Written Exam and Oral Exam – constituted the City's confidential information that was not intended to be shared with or disseminated to the candidates.

64. On or about October 11, 2018, DAVID DUNN, the defendant, forwarded Consultant-1's email with the "Bridgeport Police Chief Questions," from his City email account to his own personal email account.

65. On or about October 15, 2018, approximately four days before the Panel Interview, DAVID DUNN, the defendant, texted ARMANDO J. PEREZ, the defendant, "Call me regarding sgt exam." Telephone records reflect that PEREZ's cellphone then called DUNN's cellphone, and DUNN's cellphone later returned the call, which lasted a little over a minute. There had not been a call between PEREZ's and DUNN's cellphones for more than a month.

66. In advance of the October 19, 2018 Panel Interview, Consultant-1 provided the five panelists with her notes from each candidate's previous Oral Exam. Consultant-1 also provided the panelists with each candidate's cover letter, résumé, and essays, which in the case of ARMANDO J. PEREZ, the defendant, had been substantially prepared by Officer-1 and Officer-2 at PEREZ's direction.

67. According to Panelist-1, who was one of the five interviewers selected by Consultant-1 and DAVID DUNN, the defendant, to conduct the Panel Interviews, on or about October 18, 2018 (the day before the Panel Interview of ARMANDO J. PEREZ, the defendant), DUNN called Panelist-1 at home.[5] During that call,

---

[4] Based on my review of the packets Consultant-1 eventually distributed to the exam panelists, several of the highlighted questions were included as questions to be asked during the panel exam.

[5] Based on my review of phone records, I believe this call likely occurred on October 17, 2018, when call records reflect a 14-minute call between DUNN's work phone and Panelist-1's cellphone. As such, the call referred to by Panelist-1 likely occurred two days, not one day, prior to the Panel Interview of PEREZ.

DUNN stated that the Mayor wanted PEREZ to be "in the top three."[6] Panelist-1 understood DUNN to be asking Panelist-1 to score PEREZ higher and/or to influence other panelists to do the same. Panelist-1, who had served on panels in prior examination processes for the City and never received a similar call from DUNN, found DUNN's statement to be "totally inappropriate" given his position and the importance of the independent examination process. Panelist-1, who reported DUNN's call and comments to Consultant-1 shortly after the Panel Interviews concluded, denied that DUNN's call or comments influenced Panelist-1 in evaluating or scoring the applicants, including PEREZ.[7]

G. *DUNN Certifies that PEREZ Placed in the Top Three in the Police Chief Examination Process*

68.    Following the Panel Interviews, the fourth and final stage of the Examination Process, ARMANDO J. PEREZ, the defendant, was ranked second.   On or about October 19, 2018, Consultant-1 provided the rankings to DAVID DUNN, the defendant, who certified the three highest-ranked candidates, including PEREZ, to the Mayor.

69.    On or about October 19, 2018, after learning that he had placed in the top three – and therefore was eligible to be selected by the Mayor for the police chief position – ARMANDO J. PEREZ, the defendant, spoke to Officer-1 on a telephone call, which Officer-1 recorded at the direction of the FBI.   During that call, PEREZ told Officer-1 that he had placed second in the police chief Examination Process and "I owe this to you."

70.    After the police chief Examination Process was complete, the City issued a press release announcing the top three candidates.   DAVID DUNN, the defendant, was quoted as saying, "I am pleased with the nationwide search and selection process for police chief.   We saw as many as seventeen valid applicants from across the country and have taken great measures to ensure a fair and competitive process.   Bridgeport will be served well."

---

[6] As set forth in Paragraph 14, above, the City's Charter, Chapter 13, Section 4(b)(2) requires that the personnel director certify to the mayor only the "three (3) candidates standing highest upon the employment list for such position," from which the Mayor can then select the chief.

[7] Consultant-1 has similarly told law enforcement that Panelist-1 reported DUNN's call and statements regarding PEREZ on or about October 19, 2018, around the time of or shortly after the panel exams, but could not recall when during the day that occurred.

H. *The Mayor Appoints PEREZ as Chief of Police and the City Awards Him a Five-Year Contract*

71.   On or about November 5, 2018, the Mayor announced that he had selected ARMANDO J. PEREZ, the defendant, as the permanent Chief of Police.  PEREZ and the City subsequently entered into a five-year contract, which included a clause stating that PEREZ had been designated by the Mayor as his appointee in accordance with the City Charter.

72.   The City's contract with ARMANDO J. PEREZ, the defendant, for the position of Chief of Police provided for an annual salary of $145,428.  Under the terms of PEREZ's contract, and in addition to his salary, PEREZ was able to cash out more than $300,000 of accrued leave time.  Additionally, PEREZ's contract with the City was for five years and could be renewed for an additional five-year term.  Thus, PEREZ has contractual job security as the permanent police chief until 2023, and possibly until 2028.

73.   According to a *Connecticut Post* article, after his swearing in ceremony, ARMANDO J. PEREZ, the defendant, publicly "insisted he was given no shortcuts by City Hall:  'I did this on my own.'"

**PEREZ's First FBI Interview**

74.   On the morning of February 15, 2019, I and another FBI special agent conducted a voluntary interview of ARMANDO J. PEREZ, the defendant.  The interview took place in PEREZ's office in BPD headquarters, and concerned the City's Examination Process for the Chief of Police position.

75.   During the interview, ARMANDO J. PEREZ, the defendant, was asked whether he was coached or had any assistance during the police chief Examination Process.  PEREZ responded that Officer-1 and Officer-2 had helped write his résumé and cover letter.  PEREZ did not disclose that Officer-1 and Officer-2 had also helped research and write PEREZ's essays as part of the Written Exam, nor did he disclose that Officer-1 had drafted answers to the Oral Exam questions.  PEREZ also did not disclose anything about the assistance DAVID DUNN, the defendant, had provided to him.

76.   ARMANDO J. PEREZ, the defendant, was also specifically asked whether he was given any materials related to the Oral Exam in advance, including information about the questions or topics to be covered during the Oral Exam with Consultant-1.

PEREZ answered that Consultant-1 had never provided him with interview questions, topics, or anything else that would have given him an advantage over other candidates prior to the interview. PEREZ was then asked whether anyone other than Consultant-1, such as a City employee, had provided him with confidential information about the police chief Examination Process. PEREZ answered that he spoke to DAVID DUNN, the defendant, about the process because PEREZ was frustrated with how long it was taking. PEREZ did not, however, disclose that DUNN had provided him confidential information about the Oral Exam, including the questions to be asked.

77. ARMANDO J. PEREZ, the defendant, was asked whether DAVID DUNN, the defendant, had provided PEREZ with any confidential information regarding the Examination Process. PEREZ responded that, as far as he knew, he had not been provided any confidential information, such as dates, times, or interview participants. PEREZ once again did not disclose that DUNN had forwarded to him materials – including materials that were specifically identified as "confidential" – such as the questions to be asked during the Oral Exam or the scoring guide for the Written Exam. PEREZ was then specifically asked whether he had received test questions or scoring sheets in advance, or anything else that would give him an advantage over other candidates, PEREZ replied "No," and asked "Why would someone provide that to me?"

78. ARMANDO J. PEREZ, the defendant, was then specifically asked whether DAVID DUNN, the defendant, had provided him with confidential information during the Examination Process that would give PEREZ an advantage. PEREZ answered "no," and stated that he thought that whatever DUNN provided to him had been provided to everyone else.

**Perez's Post-Interview Conduct**

79. Almost immediately after his February 15, 2019 FBI interview, ARMANDO J. PEREZ, the defendant, began communicating with others involved in the conduct covered by the FBI interview.

80. Approximately five hours after the February 15, 2019 FBI interview concluded, telephone toll records show that ARMANDO J. PEREZ, the defendant, called DAVID DUNN. That call last approximately a minute and a half.

81. Later on February 15, 2019, according to Officer-1, a civilian employee of the BPD, who served as a driver for ARMANDO J. PEREZ, the defendant, ("Driver-1") contacted Officer-1 by text and phone to tell him that PEREZ was concerned that his

phone was tapped, that Driver-1 was going to find another phone for PEREZ, and that PEREZ wanted Driver-1 to meet him the next morning to call Officer-1 from Driver-1's phone.

82.   That same day, according to Officer-2, ARMANDO J. PEREZ, the defendant, told Officer-2 that FBI agents came to his office earlier that day and asked him questions about the Examination Process, including who helped him with his application, the timing of the test, and whether someone received information early during the police chief selection process.

83.   Later that day, according to Officer-2, he called ARMANDO J. PEREZ, the defendant.  PEREZ asked Officer-2 to stop by PEREZ's office after Officer-2 was interviewed by FBI agents.  At PEREZ's office, PEREZ told Officer-2 that PEREZ had not done anything wrong and that PEREZ could have hired anyone to help him in the Examination Process.  PEREZ further stated that the other candidates received everything that PEREZ received.  PEREZ said he also told the FBI agents to speak with DAVID DUNN, the defendant. PEREZ said he was trying to figure out who provided the FBI with information about the Examination Process, and speculated it was Officer-1 or another former City employee.

84.   Also on February 15, 2019, ARMANDO J. PEREZ, the defendant, met with a BPD officer who, in addition to working for the BPD, is a Task Force Officer assigned to the FBI's Bridgeport office ("Task Force Officer-1"), to attempt to learn information about the FBI investigation concerning the police chief Examination Process.  According to Task Force Officer-1, on the morning of February 15, 2019, he received a phone call from another BPD officer instructing him to report to PEREZ's office.  Task Force Officer-1 did so, and PEREZ explained that he was interviewed earlier in the morning by two FBI agents, and asked Task Force Officer-1 what he knew about them.  PEREZ explained that the agents asked him questions about the Examination Process.  PEREZ also stated that Officer-1 and Officer-2 helped him study for the examination, and that he thought what he got from DAVID DUNN, the defendant, had been given to all of the other candidates.

85.   On February 19, 2019, ARMANDO J. PEREZ, the defendant, was served, through counsel, with a grand jury subpoena for documents.  That same day, according to my review of toll records, PEREZ and DAVID DUNN, the defendant, exchanged several short phone calls.

86.   That same day, according to Officer-2, ARMANDO J. PEREZ, the defendant, requested that Officer-2 meet PEREZ in his office, where the two met alone.  PEREZ told Officer-2 that he had

received a subpoena and he had spoken with DAVID DUNN, the defendant, who had told PEREZ that he had not responded to the agents' request for a meeting, and that the agents no longer needed to speak with DUNN.  PEREZ told Officer-2 that PEREZ could resign if something were to happen.  PEREZ raised DUNN's July 18, 2018 email attaching the Oral Exam questions, stating that he thought everyone had received it.  According to Officer-2, he understood from PEREZ's statements that, in fact, only PEREZ had received the Oral Exam questions.

### DUNN's FBI Interview

87.  On February 26, 2020, DAVID DUNN, the defendant, accompanied by counsel, sat for a voluntary interview with a FBI special agent, investigators, and Assistant United States Attorneys from both the District of Connecticut and the Southern District of New York, at the U.S. Attorney's Office in White Plains, New York.  The interview was conducted pursuant to a proffer agreement that specifically informed DUNN that he could be prosecuted for making false statements during the interview.

88.  During the February 26, 2020 interview, DAVID DUNN, the defendant, repeatedly falsely denied telling Panelist-1 that the Mayor wanted ARMANDO J. PEREZ, the defendant, to be ranked in the top three.  Specifically, DUNN stated that he "had no conversations with the panel advocating for AJ [PEREZ].  I remember I didn't have these conversations."  Asked whether he had conveyed to any panel member that the Mayor or his administration wanted PEREZ in the top three, DUNN answered, "I never did that."  Asked whether he called Panelist-1 in October 2018, prior to the Panel Interviews, to tell Panelist-1 that the Mayor wanted PEREZ to be ranked in the top three, DUNN responded, "I didn't call [Panelist-1] on my own to tell [Panelist-1] the Mayor wanted AJ [PEREZ] in the top three," then reiterated that he "never spoke about the Mayor or administration wanting AJ in the top three."

### PEREZ's Second FBI Interview

89.  In April 2020, ARMANDO J. PEREZ, the defendant, through counsel, agreed to appear for a second voluntary interview, to take place on May 1, 2020.

90.  Prior to this interview, according to Officer-2, PEREZ showed up at Officer-2's BPD office unannounced.  According to Officer-2, PEREZ had never done so before.  During that meeting, PEREZ asked Officer-2 whether Officer-2 had been interviewed by the FBI again.  PEREZ also stated that he had omitted certain facts

during the FBI's February 15, 2019 interview, but said that was because PEREZ was unsure what the FBI was looking for.

91.   On May 1, 2020, ARMANDO J. PEREZ, the defendant, accompanied by counsel, sat for a voluntary interview with FBI special agents, investigators, and Assistant United States Attorneys from the District of Connecticut and the Southern District of New York, at the United States Attorney's Office in White Plains, New York.   The interview was conducted pursuant to a proffer agreement that specifically informed PEREZ that he could be prosecuted for making false statements during the interview.

92.   During the May 1, 2020 interview, ARMANDO J. PEREZ, the defendant, was asked whether he had instructed Officer-1 to sneak into BPD headquarters to retrieve Officer-1's work on the Oral Exam questions.   PEREZ falsely stated that he had told Officer-1 not to do so because people might see him.   In fact, as Officer-1's recordings reflect, on multiple occasions, PEREZ requested that Officer-1 sneak into BPD headquarters, including on July 30, August 1, and August 2, 2018.

93.   ARMANDO J. PEREZ, the defendant, also falsely stated that, since he had sent Officer-1 home on July 26, 2018, PEREZ had only seen Officer-1 twice – one time at a grocery store in Trumbull, Connecticut, and one time at a meeting with Officer-1's attorney.   In fact, as Officer-1's recording reflects, PEREZ visited Officer-1 at Officer-1's home on July 30, 2018, during which PEREZ asked Officer-1 to sneak in to BPD headquarters to retrieve confidential materials.[8]

94.   At the close of the interview, ARMANDO J. PEREZ, the defendant, declined the opportunity to amend or correct anything he had said.

---

[8] The recording also reflects that PEREZ wanted to help Officer-1 avoid the consequences of the racist messages Officer-1 had sent. For example, PEREZ noted that there were "only three" messages, that he would try to get the situation fixed, and that he "love[s]" Officer-1.

        WHEREFORE, the deponent respectfully requests that warrants be issued for the arrest of ARMANDO J. PEREZ and DAVID DUNN, the defendants, and that each be imprisoned or bailed, as the case may be.


_____

Jennifer Wagner
Special Agent
Federal Bureau of Investigation


The truth of the foregoing affidavit has been attested to me by Special Agent Jennifer Wagner over the telephone on this 9th day of September, 2020 at _____.

                /s/ William I. Garfinkel, USMJ

_____
THE HONORABLE WILLIAM I. GARFINKEL
UNITED STATES MAGISTRATE JUDGE
DISTRICT OF CONNECTICUT